STATE OF CONNECTICUT *v.* MARCUS
GONZALEZ-RIVERA
(AC 17153)

O'Connell, C. J., and Lavery and Sullivan, Js.

Argued January 13—officially released June 2, 1998

*Pamela S. Nagy,* assistant public defender, for the appellant (defendant).

*Leon F. Dalbec, Jr.,* assistant state's attorney, with whom, on the brief, was *John T. Redway,* state's attorney, for the appellee (state).

LAVERY, J. The defendant, Marcus Gonzalez-Rivera, appeals from the judgment of conviction, rendered after a trial by a three judge court,[1] of murder in violation of General Statutes § 53a-54a.[2] On appeal, the defendant claims that the trial court improperly (1) applied the standard for extreme emotional disturbance and therefore deprived the defendant of his constitutional right to establish a defense, (2) concluded that the defendant failed to establish his defense of extreme emotional disturbance, (3) concluded that the state presented sufficient evidence to support his conviction, (4) prevented him from eliciting relevant evidence about the victim's treatment of him and others to support his extreme emotional disturbance defense, and (5) admitted evidence of his postarrest silence and request for an attorney. We affirm the judgment of the trial court.

The trial court reasonably could have found the following facts. The defendant was employed as a seasonal employee of Clinton Nurseries in Clinton on April 6, 1994. On April 5, 1994, the defendant had a disagreement with one of his supervisors, Andrew Grella, the victim. On April 6, 1994, the defendant operated a forklift until around noon when he told the victim he did not want to work under him any longer. The defendant's other

---

[1] The three judges were impaneled pursuant to General Statutes § 54-82, which provides in relevant part: "(a) In any criminal case, prosecution or proceeding, the party accused may, if he so elects when called upon to plead, be tried by the court instead of by the jury; and, in such case, the court shall have jurisdiction to hear and try such case and render judgment and sentence thereon.

"(b) If the accused is charged with a crime punishable by death or imprisonment for life and elects to be tried by the court, the court shall be composed of three judges to be designated by the Chief Court Administrator, or his designee, who shall name one such judge to preside over the trial. Such judges, or a majority of them, shall have power to decide all questions of law and fact arising upon the trial and render judgment accordingly. . . ."

[2] The defendant was also convicted of carrying a pistol without a permit in violation of General Statutes § 29-35.

supervisor, Jose Konst, was called to the area to talk to the defendant, but the defendant repeated that he would no longer work for the victim. The victim told the defendant to "punch out." The defendant went to building D on the nursery complex where a time clock was located and punched out. Because work had not ended for the other employees, the defendant went to the parking area and sat in the van that provided the employees transportation between their homes and the nursery.

After sitting in the van for approximately twenty to thirty minutes, the defendant returned to building D to get a drink of water. In building D, he spoke to two mechanics who worked there and told them, "Andy quit me," referring to his having been told to punch out. The defendant then lingered there for approximately ten minutes when the victim entered building D to have a tire repaired. The victim asked the defendant why he was there and if he had punched out. The defendant replied that he had. The victim then entered a nearby rest room and emerged shortly thereafter. As the defendant walked past the victim to exit the building, he drew a .40 caliber semiautomatic pistol from the area of his waist, aimed at the victim's head and fired. The victim fell to the floor, and the defendant walked up to him and fired three more shots into the victim as he lay on the floor. There were no witnesses to the shooting, but the defendant was seen fleeing building D, stuffing an object into the waist of his trousers. All four shots were potentially fatal, and it was determined that the victim died of a homicide by multiple gunshot wounds.

The defendant fled through the nursery and was tracked down approximately two hours later by a Madison police officer and his canine. He was found hiding in a marshy area across the street from the nursery. A .40 caliber semiautomatic pistol containing a magazine

with seven unfired rounds, a hat, a magazine with eleven unfired rounds, keys and a jacket worn by the defendant earlier that day were found in the immediate area. The pistol found near the defendant was the one used to shoot the victim and had been purchased in the New Haven area on September 3, 1993.

I

The defendant first claims that the trial court improperly applied the standard set forth in § 53a-54a (a) to evaluate the extreme emotional disturbance defense. We disagree.

Because the defendant failed to preserve his claim properly at trial, he seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or the plain error doctrine. "Under *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two conditions are determinations of whether a defendant's claim will be reviewed, and the third condition involves a review of the claim itself. . . . *State* v. *Sanders*, 37 Conn. App. 219, 220, 655 A.2d 805, cert. denied, 233 Conn. 909, 658 A.2d 981 (1995); *Wilson* v. *Cohen*, 222 Conn. 591, 603, 610 A.2d 1177 (1992); *State* v. *Graham*, 33 Conn. App. 432, 442, 636 A.2d 852, cert. denied, 229 Conn. 906, 640 A.2d 117 (1994)." (Internal quotation marks omitted.) *State* v. *Santos*, 41 Conn. App. 361, 364, 675 A.2d 930, cert. denied, 237 Conn. 932, 677 A.2d 1374 (1996). As in *Santos*, the defendant claims that the three

judge court, by misconstruing the extreme emotional disturbance standard, denied him the constitutional due process right to establish a defense. Because the record is adequate for review and the claim is of constitutional magnitude, we will review the defendant's claim.

Section 53a-54a (a) provides in pertinent part that "in any prosecution [for murder] under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be . . . ." "[T]he statute sets forth a standard that is objective in its overview, but subjective as to the defendant's belief." *State* v. *Elliott*, 177 Conn. 1, 7, 411 A.2d 3 (1979). Thus, "the determination of the reasonableness of the explanation or excuse for the emotional disturbance must be measured from the viewpoint of a reasonable person in the defendant's situation under the circumstances as the defendant believed them to be." *State* v. *Steiger*, 218 Conn. 349, 385, 590 A.2d 408 (1991).

The crux of the defendant's claim is that because the trial court failed to articulate, in its memorandum of decision, the facts relied on in assessing the defendant's situation under the circumstances as he believed them to be, it failed to apply the standard properly.[3] The defendant concedes that the three judge court articulated the correct standard in its memorandum of decision. Specifically, the trial court stated that "we are required to measure the reasonableness of the defendant's explanation or excuse from the viewpoint of a

---

[3] The trial court denied the defendant's motion for articulation. The defendant's motion for review was granted by the Supreme Court, but the relief requested was denied.

reasonable person in the defendant's situation under the circumstances as the defendant believed them to be."

In rejecting the defendant's extreme emotional disturbance defense, the court concluded that the defendant came to work on April 6, 1994, with a fully loaded .40 caliber pistol and an extra fully loaded magazine. Further, the panel concluded that "[t]he credible testimony established that the defendant had not previously brought the pistol to work, but that he brought it that day because the day before, the victim had, according to the defendant, 'pissed me off.' We find that the defendant's loss of a seasonal position (a job he had held on and off since 1987, with no spouse or family to support as he lived with his brother, Noel) did not place the defendant in an extremely unusual and overwhelming state, or that he had an extreme emotional reaction to it, as a result of which there was a loss of self-control where reason was overborne by extreme intense feelings."

The fact that the trial court's memorandum of decision does not articulate its findings as to what the defendant's mental state was at the time of the shooting, or the particular situation as the defendant perceived it to be, does not indicate that it did not apply the standard properly. We conclude that the defendant has failed to demonstrate that a constitutional violation clearly exists that clearly deprived him of a fair trial.

II

The defendant's second claim is that the trial court improperly found that he had failed to prove his affirmative defense of extreme emotional disturbance by a preponderance of the evidence. We disagree.

"Our Supreme Court has stated that in determining whether the defendant has proven the affirmative defense of an extreme emotional disturbance . . . the

[trier of fact] must find that: (a) the emotional disturbance is not a mental disease or defect that rises to the level of insanity as defined by the Penal Code; (b) the defendant was exposed to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness; and (c) the defendant had an extreme emotional reaction to it, as a result of which there was a loss of self-control, and reason was overborne by extreme intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions.' *State* v. *Elliott,* supra, 177 Conn. 9.

"Although this case presents an unusual procedural posture where a three-judge panel serves as the finder of facts (instead of a jury) and where the burden is on the defendant to prove his affirmative defense, the normal rules for appellate review of factual determinations apply and the evidence must be given a construction most favorable to sustaining the court's verdict. *State* v. *Chetcuti,* 173 Conn. 165, 172, 377 A.2d 263 (1977). Moreover, the question is whether upon the facts established and the inferences drawn therefrom the [fact finder] could have reasonably concluded that the cumulative effect of the evidence failed to establish that the defendant acted under the influence of an extreme emotional disturbance for which there was a reasonable explanation or excuse. In sum, except where an abuse of discretion is clearly shown, the conclusion of a trial court should be affirmed so long as it is a reasonable one on the basis of the evidence adduced and the inferences drawn therefrom. *State* v. *Zdanis,* 182 Conn. 388, 391–92, 438 A.2d 696 (1980), cert. denied, 450 U.S. 1003, 101 S. Ct. 1715, 68 L. Ed. 2d 207 (1981). In the final analysis . . . the ultimate determination of the presence or absence of extreme emotional disturbance [is] one of fact for the trier . . . . *State* v. *Steiger,* supra, 218 Conn. 383, quoting *State* v. *Zdanis,* supra,

395." (Internal quotation marks omitted.) *State* v. *Santos*, supra, 41 Conn. App. 367–68.

The defendant presented evidence at trial that he had been physically and verbally abused by his father as a child. The defendant testified that approximately one year before the defendant murdered the victim, the defendant's father called him a "maricon."[4] The defendant also presented evidence that his relationship with the victim was not very good. According to the defendant's expert witness, the defendant described the victim in the same way he described his father, as someone who was humiliating, authoritarian, critical, and demanding. The defendant testified that when he encountered the victim in building D, the victim called him a maricon. As a result, the defendant claims he became enraged, lost control of himself and shot the victim.[5]

"In a case in which the evidence is conflicting, it is the quintessential . . . function [of the fact finder] to reject or accept certain evidence, and to believe or disbelieve any expert testimony." *State* v. *Raguseo*, 225 Conn. 114, 123, 622 A.2d 519 (1993). "The court might reject [expert testimony] entirely as not worthy of belief or find that the opinion was based on subordinate facts that were not proven." *State* v. *Blades*, 225 Conn. 609, 629, 626 A.2d 273 (1993). "[T]he trier of fact can disbelieve any or all of the evidence . . . and can construe that evidence in a manner different from the parties' assertions . . . ." *State* v. *Steiger*, supra, 218 Conn. 381.

The state presented evidence that permitted the inference that the defendant planned the murder of the vic-

[4] The court heard testimony to the effect that maricon is "an extremely insulting word to use in Spanish. It's stronger in Spanish than the word faggot is in English."

[5] The defendant's expert witness testified on cross-examination that his opinion regarding the defendant's emotional state at the time of the shooting would be different if the victim was found not to have called the defendant a maricon shortly before the shooting.

tim. There was evidence that after waiving his rights under *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the defendant voluntarily informed a state trooper that because the victim had "pissed me off" the previous day, he brought a gun to work, something he had never done before. Further, there was evidence that the weapon was fully loaded when fired and that the defendant brought an extra fully loaded magazine to work that day. In addition, there was evidence to support the inference that the defendant's job was not important to him and, therefore, that the loss of the job would not have placed the defendant in an extremely unusual and overwhelming state. There was also evidence that the defendant appeared to be calm just before the shooting and while making a statement just after he was apprehended.

We conclude that the trial court reasonably could have determined that the defendant failed to prove, by a preponderance of the evidence, the existence of an extreme emotional disturbance.

### III

The defendant next claims that his conviction should be set aside or that he should receive a new trial because the court's verdict is against the weight of the evidence. Our resolution of the defendant's first two claims also resolves this claim. The defendant's conviction was not against the weight of the evidence and, therefore, he is not entitled to an acquittal.

### IV

The defendant's fourth claim is that the trial court improperly prevented him from eliciting relevant evidence about the victim's treatment of him and others to support his extreme emotional disturbance defense. Specifically, the defendant claims that his counsel was

precluded from asking the defendant and other witnesses questions that were relevant to his defense of extreme emotional disturbance. In addition to claiming evidentiary error, the defendant claims that the trial court's rulings deprived him of his state and federal constitutional rights to present a defense.[6] We disagree.

"The trial court's ruling on the admissibility of evidence is entitled to great deference. *State* v. *Castonguay*, 218 Conn. 486, 497, 590 A.2d 901 (1991); *State* v. *Sharpe*, 195 Conn. 651, 659, 491 A.2d 345 (1985). [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . *State* v. *Coleman*, 241 Conn. 784, 789, 699 A.2d 91 (1997). Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. *State* v. *Alvarez*, 216 Conn. 301, 306, 579 A.2d 515 (1990) . . . *State* v. *Beliveau*, 237 Conn. 576, 592, 678 A.2d 924 (1996); *State* v. *Colton*, 227 Conn. 231, 260, 630 A.2d 577 (1993), on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996)." (Internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 801, 709 A.2d 522 (1998). " 'Whether a trial court's erroneous restriction of a defendant's or defense witness's testimony in a criminal trial deprives a defendant of his due process right to present a defense is a question that must be

---

[6] The defendant did not make this constitutional claim at trial and seeks review on appeal under *State* v. *Golding*, supra, 213 Conn. 239–40. Because the record is adequate for review and the claim is of constitutional magnitude, we will review it. See *State* v. *Barletta*, 238 Conn. 313, 322, 680 A.2d 1284 (1996) (when evidence proffered by defendant excluded, exclusion may give rise to claim of denial of rights to present defense).

resolved on a [case-by-case] basis.' " *State* v. *Barletta*, 238 Conn. 313, 322, 680 A.2d 1284 (1996), quoting *State* v. *Jones*, 205 Conn. 723, 731, 535 A.2d 808 (1988).

## A

At trial, the defendant attempted to question Luis Gonzales, a Clinton Nurseries employee, as to whether he had ever observed how the victim treated workers there. The state objected, arguing that it was an attempt to introduce the character traits of the victim into the case and that this was improper. The defendant argued that it was relevant to corroborate the behavior testified to by the defendant. The trial court sustained the state's objection and denied the defendant's offer of proof. The defendant also attempted to question Jose Konst about a statement the defendant had made to him the night before the shooting that he did not want to work for "this guy" anymore. Konst indicated that the defendant did not tell him who "this guy" was, but it occurred to him that the defendant was referring to the victim. When the defendant asked Konst why this had occurred to him and whether it had anything to do with the victim's treatment of workers, the state objected, arguing that the defendant was attempting to get into evidence the victim's character. The court sustained the objection and also did not allow the defendant to make an offer of proof. In addition, the defendant was precluded from asking Noel Gonzales, the defendant's brother, why he quit his job at Clinton Nurseries.

"In a trial for homicide the character of the deceased ordinarily is irrelevant to the accused's guilt or innocence." *State* v. *Miranda*, 176 Conn. 107, 109, 405 A.2d 622 (1978). However, "[i]t has long been the law in this state that, in a homicide prosecution, 'an accused may introduce evidence of the violent, dangerous or turbulent character of the victim to show that the accused had reason to fear serious harm, after laying a proper

foundation by adducing evidence that he acted in self-defense and that he was aware of the victim's violent character.' *State* v. *Miranda*, [supra, 109], citing *State* v. *Padula*, 106 Conn. 454, 456–57, 138 A. 456 (1927). More recently, we joined a majority of courts when we expanded this rule to allow the accused to introduce evidence of the victim's violent character to prove that the victim was the aggressor, regardless of whether such character evidence had been communicated to the accused prior to the homicide. *State* v. *Miranda*, supra [109]." *State* v. *Smith*, 222 Conn. 1, 17, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992).[7]

In this case, there was no evidence that the victim was the initial aggressor or that the defendant feared serious harm from the victim. There is no need for the exception in this case because the reason for the exception is missing. The excluded testimony of the victim's character would not "be a circumstance contributing to a reasonable belief by the accused that his life [was] in peril and his consequent state of mind as to the necessity of defending himself and the means justifiably to be taken in so doing." *State* v. *Miranda*, supra, 176 Conn. 109. The defendant did not claim self-defense, but instead claimed an extreme emotional disturbance defense.

The crux of the defendant's argument is that the excluded testimony should have been admitted because it would have corroborated the defendant's testimony as well as his defense of extreme emotional disturbance. Specifically, the defendant argues that the excluded testimony went to the heart of his defense

---

[7] In the majority of jurisdictions in the United States, including Connecticut, it is the rule that character evidence of the victim in a homicide case is inadmissible except where the defendant admits to having killed the victim and claims to have acted in self-defense. 1 C. McCormick, Evidence (4th Ed. 1992) § 193, pp. 820–24; 40 Am. Jur. 2d 569–70, Homicide § 302 (1968).

because his defense could succeed only if other people testified that his perceptions of the victim were accurate. The defendant also argues that the admission of character evidence of the victim in a case involving extreme emotional disturbance is analogous to one involving self-defense, and that without the evidence of the victim's treatment of his employees and the defendant's lack of violent behavior, the trial court could not properly analyze the extreme emotional disturbance defense. We disagree.

The defendant contends that the excluded testimony is needed to corroborate his own testimony and beliefs and, therefore, should have been admitted. The exception to the general rule that character evidence of the victim is inadmissible; see *State* v. *Miranda,* supra, 176 Conn. 109; is narrow and specific to the situation where a defendant claims to have acted in self-defense. The defendant in this case seeks to make improper use of character evidence of the victim. The exception does not allow character evidence of the victim to be used to corroborate a defendant's claim that he was suffering from an extreme emotional disturbance. The reason for the exception is not satisfied in this situation; there was no fear by the defendant or aggression by the victim. For purposes of the extreme emotional disturbance defense in this case, evidence of the defendant's personal beliefs and state of mind with regard to the victim's character are relevant in examining whether a reasonable explanation or excuse for his actions exists. Testimony from other witnesses, however, as to their own beliefs or states of mind with regard to the victim's character are not relevant to the defendant's state of mind. It is the defendant's subjective belief that matters for purposes of the defense of extreme emotional disturbance, not the beliefs of other witnesses. We conclude that the trial court did not abuse its discretion in excluding this testimony at trial.

We also conclude that the defendant was not deprived of his right to present a defense. In relying on the defense of extreme emotional disturbance, the defendant presented evidence regarding his perception of the situation under the circumstances as he believed them to be. The defendant and his expert witness, Kenneth Selig, a forensic psychiatrist, testified as to the defendant's state of mind. Two contested facts at trial were (1) whether the victim called the defendant a maricon on April 6, 1994, and (2) whether the defendant brought a gun to work for the first time on April 6, 1994. The defendant testified that on April 6, 1994, the victim called him a maricon and that in the past he had brought the gun to work as protection. As to whether the victim called the defendant a maricon on April 6, 1994, there was no direct evidence other than the defendant's testimony. There were no witnesses to testify that this alleged insult occurred. As to whether the victim brought the gun to work for the first time on April 6, 1994, state police trooper Pablo Arroyo testified that the defendant stated that because the victim "pissed me off" on April 5, 1994, the defendant brought a gun to work the next day, something he had never done before.

We conclude that the three judge court, as the trier of fact, had enough evidence before it to understand clearly what the defendant claimed was his state of mind at the time of the shooting. There was sufficient evidence before the panel to analyze the defendant's extreme emotional disturbance defense properly and, therefore, the defendant was not deprived of a fair trial. The defendant's claim of constitutional error fails under the third prong of *Golding*.

B

The defendant was also precluded from asking his sister, Livuvana Gonzales-Rivera, questions concerning

feelings the defendant had expressed to her about the victim prior to the shooting. In addition, the court also ruled certain questions asked of the defendant irrelevant.[8]

Gonzales-Rivera testified that she did not know when the defendant had shared his thoughts with her about the victim other than that it was "a lot longer before" the shooting of the victim. The state objected on the grounds of hearsay, relevance and lack of a proper foundation. The trial court sustained the objection. The defendant argued in his offer of proof that the testimony from his sister would show that he often spoke to her about his feeling that the victim was a racist, always humiliated and picked on him and had called him a maricon, and that he had complained to his superiors about the victim. On appeal, the defendant argues that his sister's testimony would have corroborated his own testimony. On the basis of the record before us, we cannot say that the trial court abused its discretion in excluding her testimony.

The trial court could also reasonably have concluded that testimony regarding whether the defendant had ever fired a gun at someone before or had ever hurt someone before was of little relevance in determining whether the defendant was suffering from extreme emotional disturbance at the time he shot and killed the victim or whether there was a reasonable explanation or excuse for his action. As to the question regarding whether anyone had ever treated the defendant as the victim had, the court ruled that the question was not relevant at this point because the defendant argued that it was relevant to anticipated expert testimony. Later, Selig testified that the defendant described the victim

---

[8] The following questions were ruled irrelevant: (1) whether anyone else had ever treated the defendant as the victim had; (2) whether the defendant had ever fired a gun at anyone else before; and (3) whether the defendant had ever hurt anyone before.

"in very much the same way he described his father, as someone who was humiliating, very authoritarian, very critical, very demanding, very pressuring, possibly a racist." Therefore, the trial court was aware that the defendant believed that the victim's treatment of him was similar to his father's treatment of him. We conclude that the trial court did not clearly abuse its discretion or commit an injustice when it excluded this testimony.

V

Finally, the defendant claims that the trial court deprived him of a fair trial when evidence of his postarrest silence and request for an attorney was admitted and commented on by the state. We disagree.

The defendant failed to preserve this issue for appeal and now seeks appellate review under *State* v. *Golding*, supra, 213 Conn. 239–40. Because the record is adequate for review and the claim is of constitutional magnitude, we will review the defendant's claim.

A

The following facts are relevant to this issue. At trial, Arroyo[9] testified that after the defendant was arrested and transported to the Clinton police station, he advised the defendant of his rights under *Miranda* v. *Arizona*, supra, 384 U.S. 436. After telling Arroyo that he understood his rights, the defendant read the notice of rights document out loud and initialed each paragraph. The defendant then repeated that he understood his rights and stated that he would answer Arroyo's questions. Arroyo asked the defendant if he knew why he was there, and the defendant responded that he was there because he had shot his boss. The interview was then

---

[9] Arroyo is fluent in Spanish. The Clinton police department requested his assistance as a translator to facilitate communication with the defendant.

discontinued because the defendant had to be transported to a medical facility in Essex for treatment of dog bite wounds he had received during his arrest. At the clinic, the defendant told Arroyo about the events of April 6, 1994. The defendant made a number of statements to Arroyo concerning the events that ended in the killing of the victim. After being treated at the clinic, the defendant was returned to the Clinton police station. Arroyo informed the deputy chief of the defendant's admissions at the clinic and was instructed to reinterview the defendant so that the interview could be videotaped. Arroyo informed the defendant of the request and reviewed the waiver of rights document with the defendant. The defendant initialed the notice of rights card and indicated to Arroyo that he understood his rights.

Arroyo then testified as follows: "After I asked [the defendant] if he understood his rights and was willing to answer my questions, he stated that he knew that earlier he had made some incriminating statements. And that, at that point in time, he didn't want to be interviewed and that he wanted to speak with a lawyer at that time. I relayed what [the defendant] stated to me to the deputy chief and the interview was terminated." On cross-examination, the defendant asked about the second rights form and if the defendant had initialed it around 18:08 hours. Arroyo answered as follows: "Yes, that occurred first. He initialed the rights form and then he stated that he wanted to talk to the lawyer. And he knew that he had made some incriminating remarks earlier."

Officer Joseph Flynn of the Clinton police department also testified about the statements made by the defendant at the clinic. Flynn had transported the defendant to and from the clinic. Flynn also testified about the attempted second interview at the police station. In particular, Flynn testified to the defendant's reaction

upon learning that the victim had died. "[The defendant] who was sitting in a chair, sort of slumped in his chair, looked down, appeared upset, covered his eyes. We waited a few minutes to let him compose himself and again asked him if he wanted to speak further to us concerning the incident and he said no."

The defendant claims that the admission of this testimony violated his due process rights pursuant to *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). The state argues that the evidence was properly admissible because it showed the investigative efforts of the police and the sequence of events.

"In *Doyle* v. *Ohio*, supra, 426 U.S. 619, the United States Supreme Court held that 'the use *for impeachment purposes* of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment.' . . . Thus *Doyle* is not implicated if the evidence is not presented for impeachment purposes. *State* v. *Hull*, 210 Conn. 481, 490–91, 556 A.2d 154 (1989); *State* v. *Casey*, 201 Conn. 174, 182–86, 513 A.2d 1183 (1986); *State* v. *Moye*, 177 Conn. 487, 495–99, 418 A.2d 870, vacated and remanded on other grounds, 444 U.S. 893, 100 S. Ct. 199, 62 L. Ed. 2d 129, on appeal after remand, 179 Conn. 761, 409 A.2d 149 (1979). The state may present evidence 'to show the investigative effort made by the police and the sequence of events as they unfolded . . . .' *State* v. *Moye*, supra, 499. In *State* v. *Hull*, supra, 491, our Supreme Court noted that testimony concerning investigative effort that refers to a defendant's postarrest silence is constitutionally permissible [in certain limited circumstances, such as] 'where only one police officer briefly describe[s] what had transpired when [the] defendant was interviewed at the police station.' " (Emphasis in original.) *State* v. *Smith*, 42 Conn. App. 41, 48, 680 A.2d 1340 (1996).

On the basis of our review of the record, we conclude that the testimony of Arroyo and Flynn was properly admissible to show the investigative effort and the sequence of events that unfolded after the defendant's arrest. The defendant's request for an attorney was not used by the state to impeach the defendant's testimony. The defendant argues that *Hull* limited the investigative efforts exception to a situation in which only one police officer testifies to what transpired and not "where three witnesses testified to the defendant's invocation of his right to counsel and the prosecutor mentioned that invocation in his closing argument." *State* v. *Hull*, supra, 210 Conn. 491. We disagree with the defendant's reliance on *Hull*, and find this case similar to *State* v. *Casey*, supra, 201 Conn. 183, and *State* v. *Moye*, supra, 177 Conn. 499. In this case, there were only two witnesses who briefly testified to the defendant's request for an attorney, and no mention of that request was made by the prosecutor in his closing argument. We do not find that the testimony in question "signal[s] a retreat from the basic *Doyle* proposition that it does not comport with due process to permit the prosecution during the trial to call attention to [the defendant's] silence . . . ." (Internal quotation marks omitted.) *State* v. *Hull*, supra, 491. We conclude that the testimony about the investigation and sequence of events in this case was proper and not in violation of *Doyle*.

The defendant also claims that *State* v. *Plourde*, 208 Conn. 455, 464–68, 545 A.2d 1071 (1988), cert. denied, 488 U.S. 1034, 109 S. Ct. 847, 102 L. Ed. 2d 979 (1989), prohibits Flynn's description of the defendant's reaction to the news of the victim's death. We agree with the defendant that this testimony violated *Doyle*, but conclude that it was harmless beyond a reasonable doubt. "The test for harmfulness is whether there is a reasonable possibility that the improperly admitted evidence

contributed to the conviction . . . ." (Internal quotation marks omitted.) *State* v. *Hull*, supra, 210 Conn. 492. " 'A *Doyle* violation may, in a particular case, be so insignificant that it is clear beyond a reasonable doubt that the [three judge panel] would have returned a guilty verdict without the impermissible question or comment upon a defendant's silence following a *Miranda* warning. Under such circumstances, the state's use of a defendant's postarrest silence does not constitute reversible error.' " Id. In *Plourde*, our Supreme Court held that "[s]ince the state's case was based *exclusively on circumstantial evidence*, there was a 'reasonable possibility' that the improperly admitted evidence of the defendant's silence in the face of police accusations contributed to his conviction." (Emphasis added.) *State* v. *Plourde*, supra, 469. In this case, the state did not rely on circumstantial evidence to prove its case. Also, the defendant's silence did not occur in the face of accusations by the police as was the defendant's in *Plourde*. The only question before the trial court was whether the defendant was suffering from extreme emotional disturbance when he killed the defendant. We conclude that there was no reasonable possibility that this evidence contributed to the defendant's conviction.

### B

The defendant also claims that the prosecutor violated *Doyle* during cross-examination of the defendant and in his closing arguments. The defendant argues that the prosecutor improperly sought testimony concerning, and then in his closing argument improperly commented on, the defendant's failure to mention to Arroyo that the victim had called him a maricon before the shooting.

As previously stated, "[t]he United States Supreme Court in *Doyle* v. *Ohio*, supra [426 U.S. 619], held that 'the use for impeachment purposes of petitioners'

silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment.' The court stated that 'it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.' Id., 618. The court further clarified its holding in *Anderson* v. *Charles*, 447 U.S. 404, 408, 100 S. Ct. 2180, 65 L. Ed. 2d 222, reh. denied, 448 U.S. 912, 101 S. Ct. 27, 65 L. Ed. 2d 1173 (1980), where it stated that '*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.' We do not see any reason why prosecutorial comment during closing argument is not analogous to cross-examination for the purpose of the application of this rule. On cross-examination of his landlady, as well as during his own testimony, the defendant introduced evidence that he had heard the victim insult her during the argument that preceded the shooting. The fact that the defendant failed to mention the insult to his landlady during police questioning but testified to that incident during his trial is the equivalent of having given inconsistent statements for the purposes of this rule. See *State* v. *Whelan*, 200 Conn. 743, 748 n.4, 513 A.2d 86 (1986)." *State* v. *Casey*, supra, 201 Conn. 184–85.

In this case, as in *Casey*, the defendant voluntarily made statements to Arroyo after receiving *Miranda* warnings. In these statements, the defendant told the officer the events leading up to the shooting. The defendant did not mention to Arroyo that the victim had called him a maricon just prior to the shooting. At trial, however, the defendant and his expert witness testified that the victim called the defendant a maricon and that this was the triggering event that resulted in the shooting of the victim. Therefore, as in *Casey*, this is the

equivalent of the defendant's giving inconsistent statements.

The prosecutor asked the defendant why, if his trial testimony were true and the insult had such a profound effect on him, he did not tell the officer that the victim had called him a maricon. "The [question was] not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement." *Anderson* v. *Charles*, supra, 447 U.S. 409.

As our Supreme Court held in *State* v. *Casey*, supra, 201 Conn. 185, and in *State* v. *Talton*, 197 Conn. 280, 295, 497 A.2d 35 (1985), we believe that "[t]he *Doyle* decision . . . is not applicable to the facts of this case. The crucial distinction is that, here, the defendant did not remain silent after he was arrested and advised of his rights. After being given *Miranda* warnings, the defendant clearly chose to [forgo] his right to remain silent. Once an arrestee has waived his right to remain silent, the *Doyle* rationale is not operative because the arrestee has not remained silent and an explanatory statement assuredly is no longer insolubly ambiguous. By speaking, the defendant has chosen unambiguously not to assert his right to remain silent. He knows that anything he says can and will be used against him and it is manifestly illogical to theorize that he might be choosing not to assert the right to remain silent as to part of his exculpatory story, while invoking the right as to other parts of his story." (Internal quotation marks omitted.) *State* v. *Casey*, supra, 185–86.

We conclude that the prosecutor's question to the defendant on cross-examination was a proper inquiry into a prior inconsistent statement of the defendant, and that the prosecutor's comments in his closing arguments were not improper.

The judgment is affirmed.

In this opinion the other judges concurred.